

**FILED**

JUN 0 3 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Grame Kali Kanongata'a Xref:417636 (K-96)
(Name of Plaintiff)

12500 Bruceville Rd.
(Address of Plaintiff)

Elk Grove, CA 95757

2:20 - CV - 1116    EFB PC
(Case Number)

vs.                                    COMPLAINT

Scott Jones, et al

Sacramento County, et al

Jesse Gomez Coatez, et al
(Names of Defendants)

I. Previous Lawsuits:

    A. Have you brought any other lawsuits while a prisoner:  ☐ Yes  ☒ No

    B. If your answer to A is yes, how many?: _____ Describe the lawsuit in the space
below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper
using the same outline.)

        1. Parties to this previous lawsuit:

        Plaintiff _____

        Defendants _____

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983          Rev'd 5/99

1

2. Court (if Federal Court, give name of District; if State Court, give name of County)

_____

3. Docket Number _____

4. Name of judge to whom case was assigned _____

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)

_____

6. Approximate date of filing lawsuit _____

7. Approximate date of disposition _____

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution?   ☒ Yes      ☐ No

B. Have you filed a grievance concerning the facts relating to this complaint?

☒ Yes      ☐ No

If your answer is no, explain why not _____

_____

C. Is the grievance process completed?      ☒ Yes      ☐ No

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant _Scott Jones_ is employed as _Sheriff_
_____ at _Sacramento County_

B. Additional defendants Whitney Gantt is employed as Social Worker at DCFAS CPS
Kai Bensalah is employed as Social Worker Supervisor at DCFAS CPS
Amanda Stillman is employed as Emergency Response Social Worker at DCFAS CPS
NaKisha Bailey is employed as Social Worker at DCFAS CPS
Jacqueline Jones is employed as Social Worker Supervisor at DCFAS CPS
Jesse Gomez Coatez is employed as Social Worker at DCFAS CPS
Stephanie Sellers is employed as Petitioner at DCFAS CPS
        See Defendants Page 1 of 1

2

IV.    Statement of Claim

(State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Attach extra sheets if necessary.)

Background —

Late in the evening on September 30, 2015.  A fire occurred on a separate parcel adjacent to my previous residence located at 3128 Walnut Ave., Carmichael, CA. I was asleep with my children at the time in my master bedroom, my girlfriend downstairs on the couch and my cousin in my sons room upstairs next to my room. My girlfriend was awoken to pounding on the door by the Sacramento Sheriffs demanding for her to open or they will force entry. Fearing for the safety of my kids, she let herself out the front door while locking it behind her. The Sheriffs, upon questioning her, found out that she was on search & seizure and gained unlawful entry to the home through an unlocked but closed window. They woke my children & I in the very early hours of October 1, 2015. The Sacramento Sheriffs Dept. kidnapped my children and detained them while they brought me downstairs to be interrogated on the porch. (continued on Page 1 of 16)

V.  Relief.

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

I would like to sue all of the defendants for 500 Million USD $ for pain and suffering to my kids, my children's mothers, my family and so much more. I would like emergency restraining orders placed on DHHS, CPS, Sacramento County Law Enforcement Agencies. I would like an injunction placed on CPS to overhaul their protocol as well as the Sacramento Sheriff Dept. I would like the Attorney General reschedule marijuana and for CPS to take it off of their lists for reasons to remove children. I would like to see policy changes in RCCC & Sacramento main jail that they follow the constitution & observe people's due process. I would like to see the hospital policy changed regarding removing kids w/o warrants while next of kin is present. No amount of money can buy time lost for my family.

Signed this ___29___ day of ___May___ , 20__20__ .

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

___May 29, 2020___
(Date)

_____
(Signature of Plaintiff)

3

## III. Additional Defendants (Continued)

1   
2   Donna Furtado is employed as Social Worker Supervisor at DCFAS CPS

3   Monica Perez is employed as Social Worker at DCFAS CPS

4   Michelle Epsy is employed as Deputy County Counsel for DHHS

5   Teresa Rodriguez is employed as Social Worker Supervisor at DCFAS CPS

6   Franca Umeh is employed as petitioner at DCFAS CPS

7   Sacramento Department of Health Human Services

8   Sacramento County, et. al.

9   Sacramento Sheriffs Dept.

10   Child Protective Services, et. al.

11   Attorney General Xavier Bacerra

12   Sacramento Main Jail

13   Senior Assistant Attorney General James Root

14   Sacramento RCCC

15   Supervising Deputy Attorney General Brett J. Morris

16   Children's Receiving Home

17   Deputy Attorney General Randy Mailman

18   Mercy San Juan Hospital

19   Deputy Attorney General Emily Bahkle

20   Probation Dept. et. al.

21   Lt. Shaun Hampton

22
23
24
25
26
27
28

Defendants Page 1 of 1

During their interrogation, I saw that there was a substantial amount of Sheriffs and fire-fighters on the adjacent parcel. The home itself was in pristine condition, there was no signs of smoke that entered the home, no smell of smoke inside the home. There were no signs of "child endangerment" anywhere except for the vast amount of strangers with guns all over my then residence. There was not even a smidgen of smoke on the outside walls of the brick and mortar house, no broken windows, no signs of danger besides the flashing lights of sheriff vehicles and firetrucks. I was told that the fire was contained within minutes of the fire departments arrival and that the safest place for my children was inside the brick and mortar home.

Regardless of these facts and having the sole perpatrator of the alleged crime, my then brother-in-law, they interrogate my girlfriend and I while they detain my children, my then 9 y/o daughter and then 5 y/o son, disregarding the fact that their mother was merely 25 feet away, behind the yellow "Do Not Cross" tape bieng held back by authorities pleading with "law enforcement" to release the children to her. I did give and express to the officers that the kids had nothing to do with anything and that they deserved to be released to their mother as well as their right.

As the interrogation went on, the sheriffs asked me if I was aware of a butane honey oil" lab bieng conducted on the adjacent separate parcel. I told them no, that I rented the shed out temporarily to my then brother-in-law because he was going through marital problems and was kicked out of his house. I let them know that I had no idea nor wanted any part of anything he was doing as I was unaware of it entirely. I also let them know that they could fingerprint any of those items associated with "BHO manufacturing" and they would not find my DNA on any such items that were in the shed. I asked them to swab my hands and feet for any butane, they did nothing that I asked for that would prove my innocence.

While bieng detained and under interrogation, the Sheriffs came across my basement which was locked and contained my legal grow of herbs with my prescriptions on the walls.

1  I had several prescriptions posted, as well as my collective papers in the general area. My
2  prescription is/was valid as I have been a prescription holder since '2002 after being a
3  victim of crime and stabbed over 15 times. The Sheriffs, after seeing my miniature garden
4  and disregarding my legal health necessity prescription, played judge and kidnapper, took
5  my kids into custody and prepared them for the children's detent-on/adoption/foster/
6  recieving/money laundering home. The sheriffs dept., on the morning of October 1 2015,
7  disregarded the fact that the children's mother was on the sidewalk of the home
8  behind the yellow tape requesting/demanding/pleading with "law enforcement" to rele-
9  ase the kids to her. I gave them approval to let my children go to their mother or
10 my cousin who was at the residence but was not arrested instead of needlessly kidn-
11 apping my children and forcing them to be dependants of the state and using them to
12 coerce me into pleading out or the children's mother into their programs of indoctrina-
13 tion under the color of law disguised as "Family Services".
14     At the time, I was not a felon by any standard, I was unaware of my constitutional rights
15 or Boykin-Tahl rights, specifically my fourth amendment rights. My girlfriend Sarah Dame
16 was neither on the lease or an occupant, nor resided at my then place of residency. She
17 just slept over occasionally as we were dating at the time during my break up with my child-
18 ren's mother. I was heartbroken that although my girlfriend and I had nothing to do with
19 my brother-in-law's actions were not only arrested, but my children were kidnapped
20 under the color of law, even though my brother-in-law confessed to the Sheriffs that
21 the fire was caused due to his actions alone and that Sarah and I had nothing
22 to do with it nor have any knowledge or aid and abet in any of his actions.
23     My world came crashing down before me as I witnessed sheriffs discard my rights
24 as someone presumed innocent, but my children(s) rights to be released to next of
25 kin. Strangers with buisness cards took hold of my kids and started driving off.
26 A piece of my heart died that day and I cried as they were being led off to be
27 booked into the money laundering apparatuses of CPS and its affiliates as if they
28 had committed a crime.

The pre-trial punishments were so disproportionate to the allegations as there were no victims and only one true perpetrator of the alleged crime, which should have been allocated to only one person, James Jackson.

After arraignment and pleading not guilty to the allegations/charges, I find out that me and my girlfriend's bail was a whopping $100,000 each. This is huns money I didn't have as I was/am indigent. In desperation, I called an ex-girlfriend of mine to not only bail me out but my girlfriend as well. I explained to her that I was trying to help my wife regain custody of my kids while I fight the charges. She then agreed to help me on the condition that I never ask her for money again. She bailed both of us out putting her house as collateral for $200,000.

After bailing out, I immediately make efforts to get my kids back, whether it was to my ex-wife, to myself, my mother or any of my relatives. This is when I begin to lose all faith in the justice system and it's claim of impartiality and neutrality. The presumed innocent until guilty assumptions were vanquished and I begin my harsh and emotionally drainage voyage through the criminal court system, family court and the degrading indoctrination of CPS.

Out on bail from pretrial detention, I am hit with more overwhelming factors, such as being evicted from the property I was renting out. I tried to fight it as I had never been evicted before, but before I could do anything, I was trespassed out of the property. The only bright note since being released from pretrial detention, the day before being trespassed out of my rental property, my girlfriend took a pregnancy test while we were incarcerated and I was so happy to hear that we were with child. That very next day, Sheriffs ordered us to vacate the property/premises and that I could only take what I could carry, which was personal documents and my dogs.

Since I was trespassed out, I was banned from being on the property, so I had to hire help and a moving truck in order to get the rest of my family's belongings accumulated over a 7 year period in a 3200 sf home. The hired help put my belongings in 3 separate 10' x 20' storage units till I found a new residence.

The children

On October 1, 2015 at 8:35 AM, my daughter and son were officially taken forc-efully from me and my family. They were arrested and detained, catalogued and given xref numbers. My daughter Diamond Vaisia Tu'utu'ulaki Kanongata'a was given the xref: 5031476, my son Yeshua Kali Kanongata'a was given the xref: 5031475. The children were bieng held captive at: Children's Receiving Home, 3555 Auburn Boulevard, Sacramento, CA 95821.

The first batches of paperwork according to what was given to me is dated 10/5/15. The petitioner who aided and abetted in the unlawful kidnapping of my children is Franca Umeh. The supervisor that approved of the kidnapping paperwork dated for 10/5/15 is Sheilah Paschall. The form is JV-100 with my son's name Yeshua Kanongataa in the title bar with the case number 236456. Included with form JV-100 is form JV-121, with Yeshua Kanongata'a in the title bar and the case number of 236456. The allegations in the form JV-121 is so outrageous & contradicting. The allegation of the father, "Graeme Kwongata'a" having an "untrea-ted substance abuse problem" is in direct conflict with my prescription and Calif-ornia's Compassionate Act Medical Defense. The allegations of smoking "drugs" in the presence of the children is fake and highly fabricated. The allegations that we have our children help cultivate marijuana is made by people's whose sole goal is to vill-ify parents and provide "non essential" services based upon their "opinion". The accusation of using marijuana oil to treat my daughter is unsubstantiated and a flat out lie. The blatant lie of failing to provide adequate shelter is so false, it hurts my soul. The shed that "exploded" happened on a separate parcel that was so far from the actual home, there was no sign of heat signatures on the property where my children actually laid our head down. There was not one mark of smoke, no butane cans on 3128 Walnut at all, no fire that reached the "brick and mortar" home, no damaged windows, no smell of smoke ins-ide the house. These allegations are so false that these social workers of

1  corruption and coercion literally kidnapped my kids with "one liners" in 6 paragraphs.
2  A simple 6 paragraphs changed my children's lives & my family's life forever. I am so
3  heart-broken over this and it pains me to write/prosper,   as I relive it over and over
4  again. The allegations are so frivolous that it includes my girlfriend's mother who was
5  at my then residence  for a mere 2 days. It is preposterous that because the
6  DEA and Attorney General refuse to reclassify marijuana, that so many families like
7  mine are ruined. I see marijuana as an herb created by God for man to use as
8  he sees fit. The fact that a simple plant that is native to this continent before the
9  founding of the USA continues to be classified as a "schedule 1 drug" gives ag-
10 encies such as CPS unchecked power to reek havok among those who prefer nat-
11 ure's remedies over pharmaceutical drugs which have more negative side effects ass-
12 ociated to it than the herb/drug known as "marijuana."
13    Child Protective Services failed to put into account my Native Pacific Islander culture,
14 as well as the children's heritage and upbringing. Raised in the love of Christ with
15 the spirit of "Ohana", that "nobody gets left behind." The strong upbringing of
16 the children in church teaches a life of obedience, forgiveness, worship, love, pea-
17 ce, harmony, sacrifice, repentance, faith, endurance, hope, redemption and salvation.
18 The enrollment of the children in a private Christian school since 4 years old shows
19 the court that the dedication of the parents to continually work odd jobs to not
20 only house them in a 3200 sf house, but keep them enrolled in a great Christian pri-
21 vate school that not only cares about them academically and physically but Spir-
22 itually as well, shines a light on how many details  that counter CPS's disgusting all-
23 egations are conveniently left out of their report. The one sided reporting paints an
24 alternative reality that is absolutely portrayed in a fashion that promotes their ongoing
25 propaganda and use of coercion under the color of law disguised as "Family Services" that
26 do not cater to the children's religion, culture, heritage or upbringing. In fact, CPS has
27 done far more harm than good to this family, it's services are biased and one sided. The
28 turmoil that CPS has caused this family since '2015 is disproportionately unfair and racist.

1   The forms JV-121 and JV-100 is accompanied by a form called ICWA-010(A) meant to
2   inquire if the child has any Indian ancestry. I was adopted by my step father John Lowman,
3   therefore giving me 1% which entitles my children to Indian Ancestry. Sheilah Pas-
4   chall, on the date of 10/05/2015, under the penalty of perjury, declared that the chil-
5   dren have no known Indian Ancestry. John David Lowman is 100% Indian Ancestry.
6       The next batch of forms is a repeat of JV-100 except with my daughters name Diamond
7   Kanongataa in the title bar with the case number of 236457. The petitioner who
8   aided and abetted in the unlawful kidnapping of Diamond Kanengata'a is Franca Umoh under
9   the penalty of perjury. The supervisor that approved of the kidnapping paperwork dated for
10  10/5/15 is Sheila Paschall. The address listed to this social worker and petitioner
11  is their work address of 3331 Power Inn Road, Sacramento, CA 95826 with a
12  phone number to Sheila Paschall listed as (916) 875-4534 in Dept. 135.
13      Included with the JV-100 form is the JV-121 with Diamond Kanongataa in the title
14  bar and the case number of 236457. — Please refer to Page 4 of   Lines 14-28.
15  Also refer to Page 5 of   Lines 1-28. — Any reference to domestic vi-
16  olence is unsubstantiated and without merit. It is allegations like these that destroy
17  fully functional households by sowing lies and discord, twisting harmless disagreements
18  into something more sinister than what it is. The CPS agency thrives off of trump-
19  ing up allegations and taking one's children in an effort to turn child against parent,
20  mother against father and vice versa.
21      The forms JV-121 and JV-100 is accompanied by a form called ICWA-010(A)
22  meant to inquire if Diamond Kanongataa has any Indian Ancestry. Please refer to
23  Lines 2-5 on this page. — John David Lowman is Choctaw and Cherokee. Wh-
24  en I was younger, my stepfather, "Dad" would take me to all the Native Am-
25  erican Pow Wow's and to family functions. The family functions consisted of
26  ancient ceremonies, dances, stories, language and arts. His family surnames
27  are "Armstrong" and "Mankiller". Wilma Mankiller is the first female Cherokee
28  chief and is my late step dads cousin, making her my aunt & kids great aunt.

1  The next form is titled "Child Welfare Services Initial Case Plan", An 11 page document
2  outlining an outsiders view of services that can be provided to my family through means
3  of coercion. All of these services forced upon Dana Karongata's & myself were founded upon lies
4  and the manipulation of words by ink witches and paper sorcerers. The case plan
5  is a prime example of how much power a social worker has unchecked that it can
6  impact a family even before trial. The case plan was designed to sow discord
7  & weave distrust in a family whose kids had their own room but loved to sleep with mommy & daddy.
8  I have never had my children paraded in front of me like I was a murderer or preda-
9  tor. This took place since the day I got arrested, a constant presence of CPS stalking
10 my children, appearing at their schools to interrogate them and teach them lies
11 about their father who has been their hero since birth, turned villain by strangers.
12 These interrogations would happen with neither parent present and without either
13 parents consent. Such a gross intrusion into familial sovereignty, the small
14 kingdom I built for my princess and prince was ravaged by wolves of the sys-
15 tem, the queen Dana Karongatna, verbally assaulted on paper by demons
16 in sheeps clothing, threatened constantly to hate the father of her children or
17 lose her parental rights. It is such a travesty and the CPS intrusion happ-
18 ens to this day. Pretrial detention allows CPS to continue to thwart any pos-
19 tive grounds I have made as well as intimidate my family and those that guard them
20 with threats of detaining children and pawning them off into a foster home.
21   Michelle Epsy collaborated with the DHHS and CPS to admit fake evidence to
22 the court. The parents were Never read and made aware of their rights. The
23 orders from the court are based off of falsified evidence and with intentions to
24 keep my children dependant on the court. Michelle Epey did not at all inform par-
25 ents of their constitutional rights on 11/30/2015 as she said on the minute order
26 of Docket No. 15330106.
27   The court conviniently set a court date of 5/16/2016, Docket No. 15330106.
28 The minute order set a Progress Report Hearing on 8/22/16 with a goal of possible

Page 7 of 16

1   termination of dependancy. What is not being said is that none of these coerced

2   classes were needed. Neither was any court intervention. rather Irame Kano-

3   ngatoa and mother Dana Kanonogtoa are mature adults who have put the

4   children first and foremost. The parents have transcended all differences before

5   CPS, during CPS and will continue to coparent faithfully as they have done since the

6   birth of their children.

7     The dependency status bieng terminated on 8/22/2016, at 8:30 AM on the min-

8   ute order of Docket No. 15370106 further underscores that the invasion in

9   to this family was and is unnecessary. The court's acceptance and reliance on

10   biased social workers who disregard the family's culture, religion and upbring-

11   ing would shock the conscience of any loving parent. The social workers dis-

12   regarding of the parental rights of both mother and father since 10/01/15

13   shows just how much an agency left unchecked will use children to further their

14   organizations goals of "Family Services" under the color of law with kindred

15   terms such as "Reunification" to disguise a mult-faceted money laundering

16   operation using "Families" as it's central target. Divide and conquer exists in

17   this governmental agency. The following chapter makes my heart sad &

18   distresses me to this day. The kidnapping of my next child on May 17, 2016

19   crushed my soul, killed my spirit & has furthered my PTSD to levels where

20   I distrust law enforcement & connected agencies to the max.

21     Ngangatule'lei Hekele'si Kanonagta'a Afuhoi'amango was born on May 16, 2016.

22   He was/is a healthy beautiful child. It was a victory, a glorious day for my fia-

23   nce and I. The birth of our son was our hope through trials and tribulations.

24   He was born with no drugs in his system, mother had no drugs in her syst-

25   em. We were so excited, our family members who were there were ready

26   to celebrate with us, as was the world. Our son was the "First Facebook

27   Live Birth". Witnessed by thousands, all confirmed that our son was safe

28   and in good hands. Everything was fine, they asked us what did we want

1  to do with our son's placenta. We informed them that we wanted it for religous purp-
2  oses and they gave us forms to fill out. We filled them out and my fiance
3  continued to recover from giving birth to our son. The following day, May 17,
4  2020, my fiance was still trying to breastfeed when the nurse came into our
5  room and stated that she needed to do blood tests on the baby. We asked
6  if we could be present and the nurse said no and that it was mandatory.
7  Reluctantly, thinking that it was a mandatory policy, we handed over baby to
8  a stranger dressed in nurse clothing. We knew it was a huge mistake
9  when a social worker by the name of Jesse Gomez Coatez walked into
10 our room. I am literally shaking inside and my eyes are watering as I write
11 this. It is so hard to relive it but I know that these policies have led to so
12 many lives ruined and unnecessary heartache and pain.
13     Jesse Gomez Coatez walked into our hospital room without a warrant, disregardi-
14 ng our due process and parental rights, kidnapped our son, regardless of the fact
15 that we had next of kin present that already passed their tests for my two
16 oldest children. This occurred on May 17, 2016, the very next day after my
17 youngest son was born. My son Ngangatulelei Hekelesi Kanowaytaa Afuhaamango
18 was arrested the day after he was born on 5/17/2016 and detained at Mercy
19 San Juan Hospital, address of 6050 Coyle Avenue, Carmichael, CA 95608.
20 He was given the X-Ref of 5070182 and the Case Number 237267 by
21 the petitioner Stephanie Sellers on 5/19/2016 on the Form JV-100.
22     The court reading this should take note that my son was taken 5/17/2016,
23 the paperwork for their false allegations was not even filed until 5/19/2016
24 validating my claim of "kidnapping", and coercion of parents through
25 falsely imprisoning their newborn son!
26     The petition goes on to make absurd and outlandish allegations that have nothing
27 to do with my newborn as this was a new relationship, new house, fresh start.
28 I have never had a substance abuse problem & for this social worker of injustice

Page 9 of 16

1   to conjure up 4 simple paragraphs on form JV-121 & JV-129 2 days after
2   he kidnapped my child and get away with it with the help of the Sacramento
3   Sheriff's department sent my depression and anxiety levels with PTSD throu-
4   gh the roof.

5      The only reason why I pled no contest on July 15, 2016 was because my attorney
6   Alan Donato told me that the only way I can get my kid back and make CPS stop
7   was to plead out, in other words, do not resist, take the deal, regardless
8   if we were innocent. I couldn't stand to see the woman I cared about so m-
9   uch crying, in unbearable pain, our child lost to such lies. We couldn't take
10  it anymore, and we gave up the fight. It cost us everything, financially,
11  physically, emotionally, mentally, spiritually, constitutionally and even our
12  own liberty.

13     Nakisha Bailey and Jacqueline Jones aided CPS and the DHHS in develop-
14  ing an indoctrinating case plan that was based off of lies and deciet. They
15  coerced us with our child on 8/2/2016 to abide by a case plan that they
16  knew lacked merit and was founded on petty fabrications meant to misle-
17  ad and trick the courts and others.

18     Amanda Stillman aids and abets a kidnapping service. She showed up on
19  our property at 6760 Curved Bridge Rd., Rio Linda, Ca 95673 with her
20  fancy moniker "Emergency Response Social Worker" kenotes an "Emergency",
21  but there was no emergency on October 23, 2019. She showed up at about 4pm
22  after we were detained since 10AM. She writes up lies about my youngest son being
23  in danger, yet, my son was playing all day from 10AM - 4pm. The fact is
24  that he was never in danger, next of kin was outside waiting to pick him
25  up since 10:30 AM. If the Probation Officers felt that my son was in such
26  danger, why not release him to next of kin instead of waiting for a stranger
27  to put our son in their hands. It is sad to see the lies. I had already told
28  the officers that the equipment was from previous residence and the BHO

that was at the residence on 10/23/2020 was purchased for my own personal use. I let the Probation Officer know that they could test everything and see for themself that there would be discrepancies. Regardless, Amanda Stillman used her social worker status to arrest and detain my child without due process. This deception was approved and signed off by her supervisor Donna Furtado on 11/7/19.

Whitney Gantt aided and abetted by creating case plans with the goal of taking our parental rights away completely. She is affiliated with psychotic thinking and the complete dismissal of our due process. She takes paperwork and makes irrational decisions, not taking the time to get to know parents or the complexity of this case. This indicative of social workers copy and paste attitude and how supervisor's like Kai Bensalah can just sign off in approval. This case plan designed to reward CPS by funding their ongoing child trafficking ring is sick, disgusting and demented.

I am emotionally drained after writing this and I suffer from severe PTSD because of this kidnapping. If there are further details needed, please contact me, as I am 100% sure that they did my family wrong and need to pay monetarily and with their jobs and a change in policy.

1. This action arises out of Defendant's unconstitutional, illegal treatment as well as coercive tactics towards pretrial detainees incarcerated in Sacramento County's two jails, Sacramento County, Main Jail ("Main Jail") and Rio Cosumnes Correctional Center ("RCCC"). Defendant ("Sacramento County et. all") creates and perpetuates a system detaining people without due process, forsaking them of their liberty to mount a credible defense, denial of effective counsel, subjecting pretrial detainees to cruel and unusual punishments such as kidnapping their children, forfeiting of assets, loss of income and jobs, loss of time with loved ones, mind control through rigorous programming rituals injected into over crowded and understaffed jails that are home to dangerous, inhumane, depressing and degrading conditions, a cesspool for viruses.

2. Defendant regularly subjects pretrial detainees in its custody (the majority of whom are low risk and non-violent "alleged" offenders) to harsh, preemptive punishments under the color of law meant to coerce and persuade even those who are innocent into taking a deal as to not subject their loved ones from feeling the wrath of the defendants multifaceted infliction of cruel and unusual punishments. Everyday, Defendant locks up pretrial detainees who are indigent, live paycheck to paycheck and unable to afford to pay rent/mortgage while bieng in de facto detention. Pretrial detention deprives pretrial detainees of their property and ability to gather evidence, to subpeona witnesses crucial to their defense, care for their kids and loved ones, etc...

3. Defendant has deprived plaintiff and other pretrial detainees equal protection of laws. Defendant has cited and/or arrested hundreds of citizens for violating CDC guidelines while violating the very guidelines they enforce upon others. Violations and blatant disregard to the safety of the prisoners include gatherings of 10+, violations of social spacing, first responders failing to wear PPE, failure to disinfect, failure to provide sanitizer, failure to provide a safe environment, failure to address the increased stress, anxiety and mental health needs during this pandemic.

4. Defendant incarcerates people who are presumed innocent until proven guilty far beyond the time needed to catalogue, fingerprint, DNA and issue court dates subjecting hundreds if not thousands to cruel and unusual punishment to deliberately increase the chances of Defendants obtaining convictions all without due process. The competetive enterprise of ferreting out crime is a multi-billion dollar industry whose jobs and livelyhood are contingent upon inserting people into it's system and keeping them engaged, whether it is through probation, making their children dependants of the State or creating and manufacturing laws. The Defendants engage in an

1. ongoing case adequate blistery AM use of documentare con filed 06/03/20als of persecution to

2. alone "rehabilitation", while lobbying for legislation that expands its jails and connected agencies

3. who abuse their powers and authority invested in them such as Sheriffs, CPS, DCFAS, SAINTS & others.

4.   5. Defendants collaborate to institute unnecessary and excessive bails in violation of pretrial detai-

5. nees eighth amendment rights, often times failing to decrease bail to an affordable amount

6. for indigent detainees and rubber stamping probation holds on nonviolent low risk offenders. The

7. Defendants fail to offer rehabilitative incentives that offset probation where as one liberates and one

8. imprisons violating equal process of laws. The emergency bail order set to $0 bail is brazenly ignored.

9.   6. Defendant knowingly operates a modern day slavery camp where detainees are programmed

10. to work for food under the color of law in conditions that violate labor laws. Monies saved from

11. inmates working is used against them in inconspicuous ways. Constant threats and write ups

12. with no neutral detached third party is the normal procedure. Often times, grievances about staff is

13. answered by the same staff bieng grieved, leading those who filed the grievance to feel unsafe

14. about pursuing or following up. Meanwhile, Defendants subject pretrial detainees to involuntary

15. servitude by forcing them to follow their orders and commands, failure to comply can and usually

16. leads to loss of good time/liberty in violation of their thirteenth amendment rights.

17.   7. Defendant fails to provide petitioner with his medical cannabis to deal with his anxiety,

18. PTSD and chronic pains. Defendant violates equal protection as it prescribes and dispenses

19. prescriptions with what it considers contraband to other prisoners, yet fails to provide THC/

20. CBD oil, pills, infused consumables or ointments to plaintiff(s). Defenant deprives plaintiff

21. who was stabbed over 15 times with his cannabis prescription which by California law is a medical

22. necessity and even during this pandemic is considered an essential business.

23.   8. Defendant(s) have been aware of the constitutionally and legally inadequate care and con-

24. ditions in its jails for years. Reports from multiple outside agencies and consultants have repeatedly

25. documented overcrowding and understaffing in jails, major deficiencies in health care, ex-

26. cessive use of isolation and the denial of rights to those with disabilities. The in-

27. adequate care ranges from giving inmates the wrong pills to failure to give them their heart monitor-

28. ing devices, and worse! Conditions in jail range from black mold to leaky housing and worse!

9. In the past decade, reports have detailed significant deficiencies in the treatment of individuals in the Sacramento County jails and in particular, the treatment of individuals with disabilities such as myself who suffers from PTSD. Inspector General reports, Grand Jury reports, and reports completed by subject matter experts retained by the County have repeatedly made clear that the health and well bieng of people incarcerated in the jails are at serious risk. They have found that even before this Covid-19 pandemic, the conditions are "unlikely to meet constitutional standards" and identified "serious violations" of the rights of people with disabilities such as plaintiff.

10. In 2015, after a detailed investigation, Disability Rights California issued a report on conditions in Sacramento County jails. (Citing Mays v. Sacramento) The report documented harmful policies, practices and conditions that adversely impact prisoners and pretrial detainees, in particular those with serious mental illnesses, medical conditions, physical, sensory and/or mental health disabilities. The report detailed the jails inadequate health care system, excessive use of solitary confinement, and violations of Federal disability law. Nearly all, if not all of the deficencies identified in the report persist and recommenchations to address these deficiencies remin largely unimplemented. The problems with these jails became much more apparent with the Covid-19 pandemic. It is a cesspool waiting for a virus to make it its home. Social spacing is impossible with the overcrowding which can be minimized by the simple release of non violent pretrial detainees such as plaintiff.

11. In January 2016, Defendant stated that it would address the conditions of confinement in its jail system. Defendant also stated that it would retain neutral experts to advise about health care and custodial practices in the jails, and that their reports would be admissable in evidence and available to the public. Later on in 2018, about 2 and a half years later, the Defendant refused to comply and allow reports to be made public, showing exactly the tendency of "cover up", sweeping grievances under the rug and discouraging them entirely.

12. Since early 2016, Defendant has contracted with five nationally recognized subject matter experts to assess conditions in the jails and make recommendations. The experts issued written findings consistent with those of Disability Rights California, condemning the conditions of con-

fine people in it's jails, and calling for significant and immediate changes to address the deficiencies. (Mays v. Sacramento). Covid-19 further underscores the unpreparedness of Defendant and it's staff against a viral outbreak. It also shows Defendants blatant disregard for inmates lives as it defys executive orders, disregards CDC guidelines and the constitutional rights of inmates and pretrial detainees such as plaintiff. The Defendant and its agencies can be seen arresting people for violation of 10+ gatherings left and right while it violates the law by imprisoning 30+ to 100+ people in barracks, disregarding the very laws they force others to abide by, violating equal protection of laws. This is not just psychologically frustrating to those they incriminate with allegations but also troubling as one can rightly assume, what other laws do they willfully disobey? This blatant "above the law" attitude diminishes the credibility of those entrusted with the safety and well being of pretrial inmates like the plaintiff who suffers from PTSD.

13. Defendant subjects pretrial detainees like plaintiff who poses no risk to society or threat to the public to cruel and unusual punishments by kidnapping their children without due process, violating the most vulnerable whose voices are shuttered by an over zealous government who practices monetary rituals that include fostering the children off, inserting them into preadoption homes, forcing the parents into indoctrinating "reunification services" while employing many social workers who have never had children all while aiding and abetting the money machine that values no life. The same government who has made legal the murder of over 50 million babies is the same government who makes vague entrapment terms such as "child endangerment", whose bar is so low, that a child doesn't even have to be harmed at all for Defendant to kidnap children even while next of kin with no criminal record is present such as plaintiff. Defendant operates a multifaceted enterprise/corporation with criminal practices under the color of law that consist of but not limited to; Sheriffs Department, Child Protective Services, Probation Dept., Animal Control, Code Enforcement and others are tactical in their coercion techniques as to act in one accord of charging and holding pretrial detainees in de facto detention. One of their favorite methods of pretrial coercion

is to take kids from their parents, make them a "dependant" of the State, strip parents of their God given rights, detain them with excessive bail, stack charges against them, all while attacking parents from two different courts, criminal and family court. Defendant will knowingly and gladly accept guilty/no contest pleas from pretrial detainees that they know may be innocent, regardless if it may ruin their life. There are no safeguards against a overzealous prosecutor/DA who has immunity and a working relationship with the court. The conviction rate of pretrial detainees speak for themself, this county will trample on citizens constitutional rights in a heartbeat and will seek to coerce in any way possible, nothing is safe under the color of law in Defendants jurisdiction.

14. Defendant runs its operations in a manner that is demeaning to an inmates intrinsic worth opposite of what our Bill of Rights affords every human bieng in its jurisdiction. Defendant's egragious deviation from prevailing procedral norms is a gross violation of my federal constitutional rights by those charged with protecting and enforcing them.

See Exhibit 1

See Exhibit Lt. Shaun Hampton

See Exhibit Lt. Shaun Hampton 2

Plaintiff requests to leave room to amend as there are other plaintiffs to be added to this lawsuit, such as my kids and family members that have been directly impacted. This kidnapping of my latest child with my grandmother present sent her to her grave early as her health deteriorated rapidly directly after our child was taken out from the hospital right in front of her eyes.

I declare under penalty of perjury that the foregoing is true and correct.

June 1, 2020                                       Kali Xonnynton
(Date)                                            (Signature of Petitioner)

Exhibit "Lt. Shaun Hampton"

# Sacramento sheriff tries to avoid virus outbreak in jails



PAUL KITAGAKI JR. pkitagaki@sacbee.com

Sacramento Sheriff's Lt. Shaun Hampton, who is in charge of operations at the Sacramento County Main Jail, stands at its entrance on April 22. The sheriff's office has implemented new procedures to keep staff and inmates safe from COVID-19 throughout the jail.

May 20, 2020

**BY SAM STANTON**
*sstanton@sacbee.com*

As county jails and state and federal prisons nationwide have grappled with crippling outbreaks of COVID-19 among inmates and staff, Sacramento sheriff's officials say they have had a remarkable experience so far, with only one inmate and no staff testing positive for the virus.

And they want to keep it that way.

"That's the hope," said sheriff's Lt. Shaun Hampton, who has overseen a series of policy changes at the Main Jail on I Street that includes a ban on all visitors, <u>releases of hundreds of nonviolent inmates to create more room inside the facility</u>, regular cleanings, <u>social distancing reminders for inmates</u> and strict rules about who gets into the jail.

That means no one gets inside the facility without first having their temperatures taken and being questioned about their health. When officers arrived with a new inmate, they're directed to park.

"They'll direct them to a parking space and they will meet them outside the back of the car with a nurse," Hampton said in a recent interview at the sheriff's headquarters. "Before they even get out of the car their temperature is taken."

As of this week, sheriff's officials say, 226 inmates have been tested for COVID-19 and one came back positive: a woman who entered the jail in late April and was kept in quarantine for seven days. She was still in isolation on Wednesday, the same day she tested positive and was released from custody.

Sheriff's officials say she

**SEE INMATES, 9A**

**290**
*Los Angeles County jail inmates who have tested positive for coronavirus since the outbreak began as of Friday.*

**36**
*Alameda County inmates who have tested positive at the Santa Rita Jail in Dublin.*

**1** ⇐ Untrue
*Sacramento County inmates who have tested positive at the main and branch jails.*

# Decrease pretrial detention for public health



**BY ERWIN CHEMERINSKY**
*Special to The Sacramento Bee*

The California Judicial Council is putting lives in grave danger by increasing the number of people who are held in jails awaiting trial. Its order on April 30, extending again the time individuals can be detained without trial will keep more people in jail for longer, risking the health of those detained and also those in the community.

The effort should be exactly the opposite, looking for every way to decrease the jail population to limit the spread of COVID-19. This virus, more than others, has the ability to spread quickly and the living conditions within jails facilitate this spread. It was reported last week that 60 percent of the prisoners at the federal prison at Terminal Island tested positively, and several have died.

There have been major outbreaks of COVID-19 in other jails and prisons across the country. Warnings from medical professionals familiar with jail populations have been dire; social distancing is not possible for those incarcerated.

The Judicial Council, in an order on March 30, authorized counties to triple the number of days an individual could be held in custody awaiting their preliminary hearing. In addition, for individuals whose trial dates were already set and have been waiting for at least 60 days (if not longer), the order authorized an additional two-month delay for their trial. All during this time, individuals who are presumed innocent can be held in jails awaiting their trials.

On April 30, 2020, the Judicial Council issued a statewide order further extending deadlines for California's superior courts to hold criminal trials. The order adds a 30-day extension of time, bringing extensions of time to hold criminal trials during the pandemic to a total of 90 days.

Extending the time for trials is based on the understandable desire to keep people – judges, jurors, lawyers, court personnel, witnesses – away from courthouses. But for people in custody, these

SEE CHEMERINSKY, 4B

## FROM PAGE 1B
# CHEMERINSKY

orders will keep them confined longer and in conditions where they are in imminent and high danger, while also increasing the risk to corrections personnel and their families.

Clearly, the California Judicial Council is aware of these risks and has displayed some interest in mitigating them. The Council issued a separate emergency order in early April providing that anyone arrested during the course of the pandemic for most misdemeanors and low-level felonies will be held on $0 bail and thereby released.

Serious and violent felonies such as murder, rape, robbery, assault with a deadly weapon and kidnapping are excluded from the emergency schedule, as well as those arrested for domestic abuse, violating a protective order and driving under the influence. Judges also retain discretion to keep inmates detained before their trial for good cause.

Unfortunately, the $0 emergency bail schedule has not resulted in the mass releases that they intended. Since the emergency bail schedule went into effect on April 13, only around 250 people have been released in Los Angeles County. This means that people remain in custody for longer periods of time because of delays in preliminary hearings and extensions of criminal jury trials.

On a given day, there are 70,000 people incarcerated in this state's jails, and thousands of people that enter the jails on a daily basis. In addition to the threat to those incarcerated, studies show that jails are likely to cause infection and illness in communities outside of the jail. High rates of pretrial detention are jeopardizing, not preserving, community safety.

There are many things that can be done. Release from jail those awaiting trial who are not a threat to public safety. Aggressively implement $0 bail. Extend hearing timelines for people at liberty while maintaining statutory speedy trial rights for people in custody.

To ensure the safety of staff, witnesses, and jurors who will need to enter the courthouses, the state should work enforce social distancing and health precautions. Lessons can be learned from the existing mandatory practices for grocery stores and other essential businesses that maintain the safety and well-being of customers as well as workers.

As our communities adjust to the pandemic, many workers have been appropriately characterized as "essential." Their continued efforts meet our basic needs. There is an implicit duty to maintain medical services, food supply chains, and delivery routes. Certainly, where presumptively innocent people are detained and seeking to exercise their rights, judges and other court personnel are essential in responding to this crisis and preventing the spread of the virus.

Their health must be protected. But this must be done without needlessly endangering the lives of others.

Many other places around the country have dramatically reduced their jail populations. California must as well to protect the health and safety of everyone in our state.

*Erwin Chemerinsky is dean and professor of law at the UC Berkeley School of Law. He can be contacted at echemerinsky@law.berkeley.edu.*

**FROM PAGE 1A**

# INMATES

May 20, 2020

never came into contact with other inmates on the jail's seventh floor, but that area was placed on lockdown as a precaution.

Another 82 tests are pending. Five employees at the Main Jail also have been tested, and all were negative.

The success of the Sheriff's Department has had at the jail, which in past years has been criticized as woefully unprepared to handle inmates' needs, stems from work that began in earnest in early February.

At the time, court sessions still were taking place in the first floor of the jail building, bringing in hundreds of people a day who crammed into the hallway together awaiting arraignments and other hearings.

"We started engaging in conversations with public health and correctional health (officials)," Hampton said. "How would we address this should it come into our building? And what steps can we take to prevent coronavirus from entering the main jail?"

One of the first steps was obvious: Reduce the number of people inside.

The sheriff's office initially released 120 inmates who were within 60 days of their release dates to make room at both jails in the event there was a COVID-19 outbreak. A court order near the end of March required releasing another 421 inmates.

Sheriff Scott Jones estimates that another 560 have been released because of zero-bail requirements.

## SACRAMENTO JAIL POPULATION CUT

The population in the jail, which holds about 2,500 inmates, was cut to about 1,500, partly because deputies also cut back on the number of people being brought in to be booked.

"Those intake numbers have gone way down," Hampton said. "Before this this all started taking place we averaged between 90 to 140 in a 24-hour period. Now, I think our highest 24 hours for bookings is right around 48, and that was kind of an anomaly because they had been averaging in the 20s."

The result is that many people who in the past might have been booked at least overnight are not being brought in at all.

"So we want to make sure that we take all the violent folks off the street, and we want our officers to do what most organizations within the region have done to decrease their bookings," he said. "But those violent offenders we want to get off the street. The people that are in our jails right now are the people that you do not want in the community."

But as the virus continued to spread and some jail systems nationwide started to see sharp spikes in infections among inmates and staff, more steps were taken. All social visits to inmates by friends and family were stopped on March 16. Three days later, superior courts shut down, ending the parade of people making their way to courtrooms in the jail.

Inside the jail, deputies

were spending time talking to inmates about social distancing, Hampton said. Chairs and tables were moved around inside break rooms to keep employees from getting too close while they ate. People who could work from home were told to do so.

Elevators inside the jail were taped with an X as far apart as possible to tell inmates where to stand to keep them from close contact.

Cleaning supplies, gloves, masks and sanitizers were doled out to staff, and inmates got access to various cleansers, although not to alcohol-based hand sanitizer.

"We don't give that out to inmates because they will drink it," Hampton said.

## CORONAVIRUS THREAT TO INMATES

Newly arriving inmates who are suspected of being sick walk through a tray with bleach solution to disinfect their shoes. Those who are booked into the jail are housed for seven days with someone who came in on the same day before being released into the general population.

Despite the efforts, there have been complaints about the safety of the Main Jail and Rio Cosumnes Correctional Center in Elk Grove. Public defenders have insisted the jail poses a threat to many of their clients and have gone to court repeatedly trying to win inmate releases because of the danger of the virus.

Federal defenders were ordered by their office not to conduct in-person visits to clients in the jail, and now handle them through video set-ups.

Prosecutors also have raised concerns about how to handle arraignments and other hearings safely, and the jail has set up videoconferencing systems that are being used for "visits" and for court hearings that are being livestreamed on YouTube and show prosecutors weighing in via Zoom.

Inmates making their initial appearances can be seen coming into the courtroom cell, where deputies wearing face masks spray and wipe down the bars after each visit.

Some inmate family members remain concerned about conditions inside, saying inmates complain to them that there are not enough opportunities for inmates to keep clean and that some in the jail are clearly sick.

"They're not able to wash their hands; they might get to do it once a day," said the mother of one inmate who asked not to be identified to avoid problems for her son. "He expressed to them that he has respiratory complaints but they don't care, they don't care about these guys at all."

Hampton says that simply is not the case, that "I can tell you this place is spotless and I intend to keep it that way."

"It's important to us to make sure our population is safe and that they're there for the judicial process," he said. "They're not there for us to punish them or to keep things from them.

"We want to make sure that we're doing right by our community."

———

*Sam Stanton: (916) 321-1091, @StantonSam*